LOUISA MARTIN, Appellant, v. MAX GRABINSKY *et al.*, Respondents.

St. Louis Court of Appeals, December 17, 1889.

1. **Promissory Notes**: DILIGENCE EXCUSING PRESENTATION : BURDEN OF PROOF. When the holder of a promissory note, in order to charge an endorser, seeks to excuse the want of due presentation of the note for payment, on the ground of inability to find the maker after diligent search, he has the burden of proving due diligence.

2. ———— : ————: LAW AND FACT. Under a conceded or established state of facts, and when the inferences to be drawn therefrom are unequivocal, the question, whether due diligence was used in the search for the maker, is one of law for the court ; but when the facts are in dispute, a finding, that due diligence was not used, when the question was submitted without hypothetical instructions, given or asked, cannot be reviewed on appeal.

*Appeal from the St. Louis City Circuit Court.*—HON. JACOB KLEIN, Judge.

AFFIRMED.

*Edward S. Robert*, for the appellant.

"The law does not require anything unreasonable of the holder to ascertain the residence or place of business of the maker, but due diligence is required ; and if the maker * * * cannot be found after due inquiries * * * the holder will be relieved of any other efforts to make presentment." Every possible exertion is not exacted. Only ordinary diligence. *Plahto v. Patchin*, 26 Mo. 392 ; Chitty on Bills, sec. 454 ; *Browning v. Kinnear*, Gow. 81. Due diligence has been exercised if inquiry has been made of "such accessible persons as from their connection with the transaction, or place, or

parties, are likely to be informed, and in acting in accordance with the information derived from them." 2 Daniel on Neg. Inst. [3 Ed.] secs. 1115, 1116, 1117; *Gilchrist v. Donnelly*, 53 Mo. 591, interpreted by *Wolf v. Burgess*, 59 Mo. 584; *Chapman v. Lipscomb*, 1 John. 293, 296 (294). If any information is given by a person who pretends to know, and that is acted on in good faith, that constitutes due diligence. *Beale v. Parish*, 20 N. Y. 407; *Lambert v. Gheselin*, 9 How. 452; *Ransom v. Mack*, 2 Hill, 587-592.

*David Goldsmith*, for the respondents.

THOMPSON, J., delivered the opinion of the court.

This action was commenced against the maker and two successive endorsers of a promissory note to recover a balance due thereon. The maker was the defendant David Hill. The petition, among other things, alleges that "said David Hill failed to pay the balance due on said note, or any part thereof, on the day when the same became due, and that the same was not presented on the day of its maturity for the reason that the plaintiff did not know where the said Hill could be found, or where his place of business or residence was on said day; that said note was placed in the hands of a notary public, and on said day diligent search and inquiry were made by said officer, but the said Hill could not be found, nor could his place of business or abode be discovered by said officer; and that said note was then and there duly protested," etc. The answer was a general denial and a plea of payment. No evidence was given in support of the plea of payment and it need not be considered. Before the trial the plaintiff dismissed as to the defendant Hill. The cause was tried by the court without a jury, and a verdict and judgment were entered for the defendants, from which the plaintiff prosecutes this appeal.

It is conceded in this court, and it is stipulated that it was conceded at the trial, that no judgment could have been rendered in favor of the plaintiff and against the defendant Max Grabinsky, because when the note fell due and was dishonored by the maker Hill, he (Grabinsky) was a resident of Shreveport, Louisiana, and no notice of the dishonor was ever served upon him.

The following instruction, requested by the plaintiff, was refused by the court, and no other instruction was requested by either party, nor was any other given: "The court declares the law to be that, on the evidence, the plaintiff is entitled to recover." It is plain that this instruction could not have been given, for the conceded reason, if for no other, that no judgment could properly have been rendered against the defendant Max Grabinsky, since the suit was not dismissed as to him.

The only other assignment of error is that the court erred in not finding for and giving judgment for the plaintiff against the defendant Samuel Grabinsky. The question at issue was whether due diligence had been exercised by the holder of the note to discover the whereabouts of Hill, the maker, in order to make demand of payment upon him, so as to charge the endorsers. The burden of proof, in respect of this issue, was on the plaintiff. This assignment of error, therefore, comes to this: Either that the court, sitting as a jury, did not give credit to the evidence adduced in behalf of the plaintiff, or else did not apply the proper conclusion of law to such evidence. If hypothetical instructions had been requested by the plaintiff, embodying the state of facts which her evidence tended to show, and these had been either given or refused, we should be able to tell upon which of these grounds the court proceeded; but, in the state of the record, we do not know whether the court to any extent discredited the testimony adduced on behalf of the plaintiff,

or what the conclusion of the court was as to the facts; and, not knowing this, we are equally in the dark as to the view of law which the court applied to the facts. In this state of the record, there is really nothing for an appellate court to review, unless the evidence adduced in behalf of the plaintiff is of that explicit character which brings her case within the rule of *Lionberger v. Pohlman*, 16 Mo. App. 392, 398, re-affirmed in *Boatmen's Savings Bank v. Overall*, 16 Mo. App. 514, and in other cases. That rule is that, "where the testimony offered in support of the allegations of the party who sustains the burden of proof is, if believed, sufficient to make out his case, and is clear, consistent with itself, delivered by an unimpeached witness, and no circumstance is developed tending to cast suspicion upon it, and no substantial countervailing evidence is offered by the other party, if the jury, nevertheless, disregard it, and return a verdict against it, it will be the duty of the trial court on motion for new trial, and of the appellate court on appeal or error, to set it aside as being the result of a manifest mistake." An analogous rule is that stated by the supreme court in *Rosecrans v. Wabash, etc., Railway Co.*, 83 Mo. 678, 680, which is, for the appellate court to consider, not whether the verdict is supported by a preponderance of the evidence, as it appears in the record, but "whether the preponderance against the verdict is so great, as to satisfy their minds that it was the result of passion or prejudice."

Proceeding under either of these rules, we find ourselves unable to say, upon an examination of this record, that the finding of the trial court was either the result of "manifest mistake" or of "passion or prejudice." An analysis of the evidence, furnished in the able argument which has been presented on behalf of the appellant, shows that, about a *month* before the maturity of the note, Mr. Rutledge, of the firm of

Rutledge & Kilpatrick, who held the note as collateral security for an advance which they had made to Mrs. Martin, the plaintiff, instituted inquiries as to the whereabouts of Hill, at his former residence at 1014 North Seventh street in St. Louis, of the tenant of the first floor; of Mrs. Cooper, an intimate friend of Hill; of the tenant in the rear of the same lot; of Mrs. McCarthy, a next door neighbor; of a casual passer-by, who knew Hill; of the Alkire Grocery Company, where Hill had been employed;—and that none of them knew anything about him, except that he had worked at the Alkire Grocery Company. Mr. Rutledge could not accurately say when he made these inquiries: "It was along in January or February of this year." This would make it two or three months before the maturity of the note, which was April 3 of this year. But further on in his cross-examination he states that "I did not say that inquiries were made in January; it was prior to the maturity of the note—not more than thirty days prior to the maturity of the note." We do not know of any rule of law which obliged the court to attach any definite value to the unsuccessful inquiries, which had been made by the holder of the note at an indefinite time, varying, according to his testimony, from three months to thirty days prior to its maturity.

The note fell due on the third of April, 1889, in the Laclede Bank, and was handed by the bank to its regular notary for the purpose of making demand, and, if necessary, giving notice of protest. The name of "The Alkire Grocery Company," had been written upon the note, after the signature of Mr. Hill, by the assistant cashier of the bank, and the assistant cashier informed the bank's notary that the information of the bank was that the place of business of Mr. Hill was at the Alkire Grocery Company. The notary testifies that he went there and inquired for Mr. Hill, on the first floor, and at the office of the cashier; that the cashier knew

nothing of him; that the cashier called up two or three individuals, and they said they knew nothing of him; that he then went, according to the custom, to the last endorsers, Rutledge & Kilpatrick, who had deposited the note in the bank, and was there told that Hill did have some connection with the Alkire Grocery Company, according to their best information, "and that they must be mistaken down there;" that he then returned to the Alkire Grocery Company, gave them that information, stating it to several persons; that considerable inquiry was then made about the house, and the witness thinks that some one recollected that there had been such a man there as a porter at one time, but had no idea of what had become of him, or whether he was in the city or not. The witness further testified that he then went to the office of the next endorser, Samuel Grabinsky, and there found a man, who said that Hill sometimes came around there; that Samuel Grabinsky was not in; that, if the witness would come later, Samuel Grabinsky might give him some information, as he usually talked with Hill when he came there. This notary, having another engagement, then took the note to the office of *another notary*, and turned it over to him, informing him of what he had done, and requesting him to take the note to the office of Samuel Grabinsky, find out from him the place of business of Hill, so as to make the proper demand, and then to protest the note.

The notary, to whom the note was thus turned over, testified that he looked in the directory, and that Mr. Hill's name was not in it; that he then went to the place of business of Samuel Grabinsky, and found Mr. Grabinsky out; that he enquired of the person in charge if he knew anything about Mr. Hill's whereabouts, and was answered, no; that he went away, returned shortly afterwards on the same day, found Samuel Grabinsky, showed him the note, and asked him if he knew anything about Mr. Hill's whereabouts, and that he said he did not.

This testimony as to the interview with Samuel Grabinsky is supported by the testimony of that gentleman, which was to the effect, that, while he remembered the interview, he did not remember whether he told the notary where Mr. Hill lived, and did not know that he knew at that time where he lived.

On the other hand, the testimony of Hill, given for the defendants, was to the effect that he had lived in St. Louis for thirty-five years at 1014 North Seventh street. The evidence indisputably showed that the note, which is the subject of the suit, was secured by a deed of trust given by Hill upon the property of his residence; that a sale took place under the deed .of trust; that an action of ejectment was brought against him by the purchaser, the plaintiff in this suit, on March 7, 1888; that he was personally served. with summons in such action on March 9, 1888; that judgment by default was entered thereon on June 12, 1888; that execution issued from such judgment; and that Hill was ousted by the sheriff under the execution on September 7, 1888. Shortly after Hill was ousted, he was arrested by the police, and incarcerated for three days and a half in the work house. For three days after he was ousted, his furniture remained on the sidewalk, and he slept there with it. He then moved to 204 Ashley street, which was about five blocks from his former residence. He remained there until about the twenty-seventh of March—a week before the search was made for him by the notaries—when he removed to a tenement house at 1012 North Broadway. He was in that tenement house sick on April 3, the day of the search for him. He frequently visited Mrs. McCarthy, who lived at 1016 North Seventh street, which was next door to his old residence. He frequently visited a saloon which was about a half a block north of his old residence, and continued to visit it after he had moved. He would go into this saloon two or three

times a day—sometimes three or four times a day. He said, "I used to visit the saloon all the time after I moved away." He went to visit Mrs. McCarthy, and also to see Mrs. Coleman every time he passed his old residence.

It was admitted by counsel that Hill lived on the property in question (1014 North Seventh street) at the time the city directory of 1888 was published, and that he lived there up to the time of its publication, and was in the directory as living there. The testimony of the second notary as to looking in the directory on his cross-examination was : "I looked in the last edition of the city directory. I do not know what it was. I do not know whether I looked in the directory of 1888, or not. I looked in the city directory at my office—that is the last one issued. It was the last one delivered at our office." It does not appear whether any later edition of the city directory, than that for the year 1888, had been published and delivered on the third of April, 1889, when the search was made.

We have no doubt that the question, whether due diligence has been used in finding the maker of a promissory note, so as to make demand upon him, is, on a conceded or established state of facts, where the inferences to be drawn from them are unequivocal, a question of law. *Crawford v. Berry*, 6 Gill & J. [Md.] 63, 70; *Brooks v. Elgin*, 6 Gill, 254, 260; *Dyas v. Hanson*, 14 Mo. App. 363, 369. But we do not perceive how this principle can help out the plaintiff on this appeal, since it cannot be said, in such a state of the record as we have here, and in opposition to a verdict rendered by the trial court, sitting as a jury, that any particular state of facts has been established, upon which we can pronounce the conclusion of the law. If hypothetical instructions had been requested, embodying the theory of the plaintiffs as to the rule of law which is to govern, we might be able to see from the

rulings of the trial court thereon, upon what theory of fact and law the court based its conclusion. But this is an action at law, and we are merely an appellate court. We cannot take the testimony of the witnesses and say what portion of it, so far as it worked in favor of the plaintiff, the trial court was bound to believe; in other words, we cannot construct a special verdict in this court, for the purpose of pronouncing thereon the conclusion of the law.

The judgment of the circuit court will accordingly, be affirmed. It is so ordered. All the judges concur.